UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:12-CV-00157-LLK

**ADRIENA POWELL**                                                                          **PLAINTIFF**

**v.**

**CAROLYN COLVIN**                                                                       **DEFENDANT**
   **Acting Commissioner of Social Security**

### MEMORANDUM OPINION AND ORDER

Adriena Powell filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of an administrative decision of the Commissioner of Social Security, who denied her application for disability benefits. The parties have consented to the jurisdiction of the undersigned Magistrate Judge to determine this case, with any appeal lying before the Sixth Circuit Court of Appeals.

Ms. Powell asserts that the administrative law judge (ALJ) made several errors in his opinion. In her fact and law summary, Plaintiff focuses upon her allegedly disabling mental impairments and other subjective symptoms. Docket 31. The Court finds those arguments to be unpersuasive.

However, in her second supplemental brief, she contends that the vocational hypothetical upon which the ALJ's denial decision was based failed to include the ALJ's own finding that "the claimant is unable to lift [] more than 10 pounds on the right due to adhesive capsulitis" (AR, p. 20). Docket 35. This argument is persuasive.

Therefore, the Court will REMAND this matter to the Commissioner for a new decision and presentation of a new vocational hypothetical that contemplates all of the functional limitations supported by the administrative record and found credible by the ALJ.

### Background Facts and Procedural History

In November, 2007, Plaintiff was last gainfully employed. At that time, she was working at a Burger King in Issaquah, Washington, and a stack of boxes fell and hit her on the head and shoulders.

Plaintiff filed a claim for Social Security disability benefits due to adhesive capsulitis of the right shoulder,[1] bilateral carpel tunnel syndrome, bipolar disorder, and other impairments.

In 2011, ALJ Verell Dethloff issued a decision denying Plaintiff's claim. Administrative Record (AR), pp. 14-32.

Plaintiff moved to Fort Campbell, Kentucky.

In September, 2012, the Appeals Council declined to disturb the ALJ's decision, thereby rendering his decision the Commissioner's final decision, which is presently before the Court upon judicial review. AR, pp. 1-3.

In October, 2012, Plaintiff filed her complaint in this Court. Docket 1.

In June and July, 2013, the parties submitted their fact and law summaries, which presupposed that Sixth Circuit case law governs. Docket nos. 19 and 20.

In August, 2013, the Court entered a *sua sponte* Order For Further Briefing on the question of whether Ninth or Sixth Circuit law applies. Docket 21.

In their supplemental briefs, the parties agree that Ninth Circuit law applies, citing *Pierce v. Colvin*, 2013 WL 3326716 (E.D.N.C). Docket nos. 22 and 23.

In October and November, 2013, the parties submitted new fact and law summaries premised on Ninth Circuit law. Docket nos. 31 and 32.

In November, 2013, based upon a preliminary review of the record, the Court observed an apparent inconsistency in the ALJ's findings and the controlling vocational hypothetical. The Court entered an Order For Further Briefing regarding Plaintiff's right-shoulder adhesive capsulitis and its impact upon her ability to use her right upper extremity. Docket 33.

---

[1] Adhesive capsulitis, also known as frozen shoulder, is an "adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder ... characterized by shoulder pain of gradual onset, with increasing pain, stiffness, and limitation of motion." *Hollingsworth v. Shinseki*, 2014 WL 31681 n.2 (Vet.App.) quoting Dorland's Illustrated Medical Dictionary, 2012 ed.

The parties' second supplemental briefs addressing this matter are at Docket nos. 35 and 37.

This matter is ripe for determination.

**The controlling vocational hypothetical was incomplete.**

The ALJ acknowledged that Plaintiff's right-shoulder impairment results in significant limitations affecting her ability to use her right upper extremity: "The claimant has the ability to occasionally lift and/or carry up to 20 pounds, and frequently lift and/or carry up to 10 pounds. However, the claimant is unable to lift no (sic.) more than 10 pounds on the right due to adhesive capsulitis.[2] ... The claimant is also limited to occasional handling and fingering." AR, p. 20.

The vocational expert (VE) testified that, in combination, these limitations would significant erode the vocational base for even sedentary work because the 10-pound exertional limitation on the right would tend to limit the individual to sedentary jobs[3] and the bilateral handling/fingering limitation would erode the number of available sedentary positions[4]:

> VE: There are jobs that – well, Your Honor, I'm looking at the – in terms of the manipulative limitation to occasional handling and fingering and then lifting on the right side being limited to 10 pounds, that would suggest to me that I'd be looking at jobs that are in the sedentary, unskilled level along with some of the other factors. And if someone is limited to occasional handling and fingering, ... there really are not any jobs that I can identify.
>
> (AR, pp. 59-60).

The following exchange then occurred:

> ALJ: Okay. Tell me again what limits us to sedentary.
>
> VE: Well, I think the 10-pound limitation on the right side in terms of strength or lifting would limit – would put that in the sedentary range.

---

[2] The ALJ appears to have accepted the testimony of neurologist James Haynes, M.D., that Plaintiff would be limited to "lifting of 10 pounds maximum" on the right. AR, p. 50.
[3] Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).
[4] "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." Social Security Ruling (SSR) 83-10.

3

ALJ: So people who are at the light level can't use both hands to lift 20 pounds occasionally?

VE: I'm sorry, repeat that again.

ALJ: Well, we've limited her to 20 pounds lifting total, that is using both hands, our hypothetical person could lift 20 pounds, but could only lift **20 pounds with the right arm** *(emphasis added)*. So I'm not sure why we lapsed into sedentary work.

VE: Okay. I guess I --- yeah, I didn't understand that specific lifting aspect of the hypothetical. [The VE proceeded to identify the light jobs that formed the basis of the ALJ's denial decision.]

In clarifying that the limitation was "20 pounds with the right arm," the ALJ departed from the original hypothetical, which was that the Plaintiff could only lift 10 pounds with the right arm.

Where an ALJ's denial decision is predicated upon vocational testimony, that testimony must be based upon all of the functional limitations supported by the administrative record and found credible by the ALJ. *Bayliss v. Commissioner*, 427 F.3d 1211, 1217 (9th Cir.2005). The ALJ's denial decision is not supported by substantial evidence because the controlling vocational hypothetical did not contemplate all of the limitations found credible by the ALJ: "[T]he claimant is unable to lift [] more than 10 pounds on the right due to adhesive capsulitis." AR, p. 20.

Therefore, a remand is required for presentation of a complete vocational hypothetical.

### The ALJ's questioning of the VE was leading.

The ALJ asked the VE a leading question: "So people who are at the light level can't use both hands to lift 20 pounds occasionally[5]?" The built-in suggestion was that the lifting requirements of light work can be performed, without significant reduction of jobs, by an individual who must substantially favor her left side.[6] The VE was not given a fair opportunity to challenge this vocational assumption.

The effect of this leading question was not harmless as it is not obvious that an individual who is limited to lifting 10 pounds maximum on the right can occasionally lift 20 pounds, using both hands, so

---

[5] "Occasionally" is a term of art in the present context that means "occurring from very little up to one-third of the time." SSR 83-10.
[6] Plaintiff is right-hand dominant. AR, p. 339.

as to perform the jobs of light bakery worker, scaling machine operator, and blending paint tender. AR, p. 30.

**Remaining Contentions**

Plaintiff's remaining contentions, in her fact and law summary (Docket no. 31), focus upon her allegedly disabling mental impairments and other subjective symptoms.

The ALJ acknowledged that Plaintiff suffers from mood disorder not otherwise specified (NOS) and bipolar disorder, which limit her to simple to minor detailed tasks such as 5 to 6 steps and to only superficial and infrequent interaction with the general public. AR, pp. 17 and 20.

Plaintiff's mental disability claim, considered as a whole, appears a bit situational and suspect. Plaintiff states that she has three grandchildren through a daughter who became a drug addict. Plaintiff was named temporary caretaker. Due to these new caregiver responsibilities, Plaintiff was forced to go from manager at Burger King to earning an hourly wage. After the accident in November, 2007, she claims she is disabled. AR, pp. 297, 361, and 803.

In her Function Report submitted in connection with her application for disability benefits, Plaintiff stated that "I do everything for [my three grandchildren], feed them clothes, take care of them" (AR, p. 248). In addition, Plaintiff prepares meals, does household chores, shops, attends church, and drives.

In September, 2008, psychiatrist Linda Miller examined Plaintiff at the request of the Washington Department of Labor and Industries. According to Dr. Miller, the accident at Burger King aggravated Plaintiff's pre-existing mood disorder, making it "difficult" for her to continue participating in the work force. AR, p. 299. However, Dr. Miller deemed Plaintiff's difficulty to be not "currently fixed and stable," opining that, with mental health treatment for a minimum of three months duration, she may be able to return to work. Id.

In addition, the record contains several references to possible symptom magnification. AR, pp. 22, 24, 45, 46, 345, 643, and 645.

## GAF Scores

Plaintiff relies extensively upon raw Global Assessment of Functioning (GAF) scores assigned by various treating and examining sources in the administrative record.

Dr. Miller assigned a current GAF of 51, which reflects "moderate" limitation. According to the standard GAF scale:

60-51: Moderate difficulty in social, occupation, or school functioning (e.g. few friends, conflicts with peers or co-workers).

50-41: Serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

From December 2008 through July 2010, psychiatrist Philip Perkins, D.O., treated Plaintiff. AR, pp. 405-448. On December 13, 2008, Dr. Perkins assigned a GAF of 50. AR, p. 437.

In April 2009, non-examining state agency program psychologist Vincent Gollogly, Ph.D., completed the standard Mental Residual Functional Capacity Assessment, finding Plaintiff to be "moderately" limited in 5 functional areas and "not significantly limited" in the remaining 15 areas. AR, pp. 449-451.

In July 2009, program psychologist Bruce Eather, Ph.D., affirmed Dr. Gollogly's prior assessment. AR, p. 535.

In October 2010, psychiatrist Gary Hudak examined Plaintiff at the request of the Department of Labor and Industries. Dr. Hudak's opinion was similar to Dr. Miller's: Plaintiff is unable to return to work "at this time" but she may be able to return after six months of treatment. AR, p. 857. Dr. Hudak assigned a GAF of 55.

## First Argument

Plaintiff presents five contentions in her fact and law summary. Docket no. 31.

First, she argues that the ALJ erred in rejecting the opinions of her treating mental health provider (Dr. Perkins) and the one-time examining sources (Drs. Miller and Hudak) in favor of the opinions of the non-examining state agency program psychologists (Drs. Gollogly and Eather). The argument is predicated upon the presence in the administrative record of GAF scores assigned by the treating / examining sources, which the non-examining sources and the ALJ allegedly ignored or improperly discounted: 51 ("moderate" impairment, September 2008, Dr. Miller), 50 ("serious" impairment, December 2008, Dr. Perkins), 55 ("moderate" impairment, October 2010, Dr. Hudak).

These GAF scores, even if fully accepted, do not establish that Plaintiff is mentally disabled for at least three reasons. First, GAF scores typically do not satisfy the so-called duration requirement for disability. Disability is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In contrast, "a GAF score reflects a snapshot of a claimant's presentation on the day of the examination." Wentzek v. Colvin, 2013 WL 4742993, *8 (D.Or.). Second, a GAF score is inherently subjective in the sense that different examiners would rate the same individual differently on the same occasion. In this case, there is no meaningful frame of reference as three examiners rated Plaintiff's GAF on three separate occasions. Third, as a clinical tool, GAF scores are based on somewhat uncritical acceptance of the patient's self-description of her daily activities, with no discounting of that description based upon the examiner's view of the patient's credibility, motivation, and actual capacity.

The ALJ persuasively relied upon all three bases in declining to find that Plaintiff is mentally disabled in light of the GAF scores of record:

> GAF scores are subjective estimations, and are seldom, as is the case here, adequately explained. They also assess function based on subjective report and do not assess abilities. GAF scores assess what an individual does or is doing, not what that person is capable of doing. The Social Security Administration has specifically rejected the GAF

score as a method for evaluating the severity of mental impairments. *Cowen v. Commissioner*, 2010 WL 4269295 (9th Cir.) (citing Fed.Reg. 50764-65 (Aug. 21, 2000)).

...

Assuming any validity to thee subjective [GAF] assessments, they indicate only moderate limitations. They cannot be accorded too much weight, given the claimant's activities. As noted, the claimant reported that she gets her grandchildren ready for school, does laundry, attends appointments, cleans her apartment, prepares meals, makes her bed, attends church, and goes shopping. Moreover, as indicated above, the claimant presents with severe credibility issues, which diminishes the veracity of any statements made by the claimant, especially her subjective complaints of symptoms including statements made to medical professionals.  (AR, pp. 28-29).

**Second Argument**

Plaintiff's second contention is that the ALJ erred in finding that her headaches are not "severe." The ALJ found that the headaches do not satisfy the 12-month duration requirement of 42 U.S.C. § 423(d)(1)(A):

The claimant's treating physician Irfan Ansari, M.D., also diagnosed the claimant with headaches and sleep issues. Under 20 CFR 404.1509 and 416.909, the claimant's impairment must last or be expected to last at a severe level for a continuous period of 12 months. In this case, the evidence shows that the claimant has not sought ongoing and continuous treatment for her purported headaches and sleep issues. ... Claimant has failed to demonstrate headaches of a frequency, severity and nonremediable nature, such that they would prevent work.  (AR, p. 17).

Plaintiff has failed to show that, notwithstanding diligent pursuit of appropriate medical treatment, including anti-migraine medication, the pain and other subjective symptoms caused by her headaches would be expected to significantly interfere with her ability to hold a job on a continuous basis.

**Third and Fourth Arguments**

Plaintiff's third and fourth contentions allege that the ALJ's discounting her testimony of disabling limitation due to pain and other subjective symptoms did not comport with the requirements

of SSR 96-7p ("Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements").

Because the ALJ did, in fact, acknowledge some degree of limitation due to subjective symptoms, this is a so-called "excess pain" case. The dispositive question, then, is whether the ALJ erred in declining to find limitations due to subjective symptoms in excess of the ALJ's RFC finding.

The ALJ acknowledged that Plaintiff is limited to lifting no more than 10 pounds on the right due to adhesive capsulitis; occasional handling and fingering due to carpel tunnel syndrome; and simple to minor detailed tasks (5 to 6 steps) and superficial and infrequent interaction with the general public due to mood / bipolar disorder. AR, p. 20.

SSR 96-7p provides that, in conducting the pain / credibility assessment, the Commissioner should consider the following factors:

   1. The individual's daily activities;

   2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

   3. Factors that precipitate and aggravate the symptoms;

   4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

   5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

   6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

   7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

In this case, the ALJ relied upon evidence of exaggeration / symptom magnification in the medical records to discount Plaintiff's excess pain complaints. AR, pp. 22 and 24. Tendency to

exaggerate is a legitimate factor in determining credibility. *Tonapetyan v. Commissioner*, 242 F.3d 1144, 1148 (9th Cir.2001).

In October, 2008, occupational therapist Eileen Rollins found that Plaintiff's pain complaints have "low reliability" because:

> It is noted that she rated her pain to be an intense level, though did not display changes in behaviors, postures or altered movement patterns that would be consistent with this high pain rating. Low physical effort was offered with maximum voluntary effort testing, as noted by 8/10 coefficients of variation exceeding the cut point and 4/6 tests not reflecting a bell-shaped curve.         (AR, p. 345).

In August, 2008, Plaintiff's treating physician, Dr. Ansari, released Plaintiff to return to work. AR, p. 318.

In July, 2009, Paul Darby, M.D., opined that multiple inconsistencies on the physical exam were "strongly suggestive of symptom magnification" (AR, p. 645), including the following:

> At the beginning of the examination the patient demonstrates to me how the stack of boxes fell on her and in doing so she rapidly and easily throws up her left arm to a point where the left glenohumeral joint is at 150-160 degrees of abduction. She does not appear to be in any pain as she demonstrates. She also gestures rapidly with the left arm moving quickly through various degrees of shoulder flexion and abduction, internal and external rotation.         (AR, p. 643).

At the administrative hearing in May, 2011, James Haynes, M.D., testified that Plaintiff's subjective symptoms and complaints outweighed the objective medical evidence. AR, pp. 45-46.

In addition, the ALJ discounted Plaintiff's complaints of disabling subjective symptoms due to her daily activities, including child care responsibilities. "Daily activities" is the first factor identified in SSR 96-7p, and one component of daily activities is child care responsibilities. *Thebo v. Commissioner*, 2011 WL 2193375 (9th Cir.) and *Denham v. Commissioner*, 2012 WL 4959630 (9th Cir.).

While the Court is sympathetic with Plaintiff's situation and is concerned that the fact that the ALJ's decision has the effect of utilizing her affection and responsibility toward her grandchildren to

undermine her credibility, the fact remains that her ability to care for three grandchildren does tend to show that, if properly motivated, she is capable of engaging in significant work-like activities.

The ALJ did not err in relying on evidence of exaggeration / symptom magnification and daily activities, including child care responsibilities, to find Plaintiff's "excess pain" complaints to be incredible. The ALJ's pain / credibility assessment comports with SSR 96-7p.

### Fifth Argument

Plaintiff's fifth and final contention is that the ALJ's RFC finding reflects what she can do on an occasional or episodic basis as opposed to "on a regular and continuing basis," which is defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p.

The argument is unpersuasive as there is no indication that the ALJ intended his RFC finding to be anything other than an assessment of what the Plaintiff can still do, despite her impairments, on a regular and continuing basis. While Plaintiff disagrees with that finding, she has failed to show that it is unsupported by substantial evidence.

### ORDER

For the foregoing reasons, this matter is REMANDED to the Commissioner for a new decision and presentation of a new vocational hypothetical that contemplates all of the functional limitations supported by the administrative record and found credible by the ALJ.